Schaffer v. Timberland Co.        CV-94-634-JD  03/18/96 P
              UNITED STATES DISTRICT COURT FOR THE
                      DISTRICT OF NEW HAMPSHIRE


Jerrold Schaffer, et al.

     v.                              Civil No. 94-634-JD

The Timberland Co., et al.


                         O R D E R


     The plaintiffs, Jerrold Schaffer and Gershon Kreuser, on

their own behalf and purportedly on behalf of a class of other

similarly situated investors, have brought this now-consolidated

securities action against the Timberland Company and two of its

directors and officers, Sidney Swartz and Jeffrey Swartz, for

losses related to a precipitous drop in the market value of

Timberland stock in December, 1994.[1]  Before the court is the

defendants' motion to dismiss (document no. 23).


                        Background[2]

     The named plaintiffs and the proposed members of the

plaintiff class (collectively the "plaintiffs") purchased various

_____

     [1]The court consolidated two separate lawsuits into the
instant action.  See Schaffer v. The Timberland Co., No. 94-634-
JD, Case Mgmt. Order (D.N.H. Aug. 24, 1995).

     [2]Consistent with the applicable standard of review,
discussed infra, the court recites the facts relevant to the
instant motion as alleged in the plaintiffs' pleadings.

quantities of publicly traded Timberland common stock between May 12, and December 9, 1994 (the "class period").

Timberland is a Delaware corporation which maintains a principal place of business and executive offices in Hampton, New Hampshire. Timberland became a public company in 1987, and, as such, files annual, quarterly, and other reports with the Securities and Exchange Commission ("SEC"). Timberland designs, manufactures, and markets men's and women's footwear, apparel, and accessories. These products are distributed to and sold by various retail locations, some owned by Timberland, in the United States and elsewhere.

Defendant Sidney Swartz serves as Timberland's chairman of the board and as president and chief executive officer. His son, defendant Jeffrey Swartz, serves as a board member, executive vice president, and chief operating officer. At all relevant times the individual defendants, as individuals or through a family trust, maintained a financial interest in the company and various subsidiaries and corporate affiliates. By virtue of their financial interest, board membership, and management positions, the plaintiffs allege that the individual defendants were at all times "controlling persons" of Timberland as defined by the Securities Exchange Act of 1934 ("the Act"), 15 U.S.C. § 78(t). Moreover, the individual defendants had "knowledge of

2

and/or access to . . . adverse non-public information concerning Timberland's business, finances, and present and future business prospects." Amended Complaint at ¶ 11(g).

Prior to and during the class period Timberland management and officers regularly provided independent securities analysts with information concerning business performance, such as operating results, revenues, anticipated earnings, inventory levels, and marketing strategy. These communications included meetings, conferences calls, briefings, and press releases. The defendants used these communications to "cause or encourage [analysts] to issue favorable reports concerning Timberland, and . . . to present the operations and prospects of Timberland to the marketplace in a falsely favorable light and to artificially inflate the market price of Timberland's common stock." Amended Complaint at ¶ 25. At times, the defendants would also endorse, adopt, or otherwise place their imprimatur on analysts' reports, projections, and forecasts.

Based on their communications with the defendants, the analysts recommended the purchase of Timberland stock and released favorable reports touting company performance and future expectations. The investment community, in turn, relied and acted on these recommendations, reports, and the information contained therein.

The plaintiffs have alleged four general patterns of conduct through which the defendants materially, falsely, and deceptively portrayed the company and its future prospects to the investment community.  First, the defendants, directly and through analysts, made "positive statements and assurances about Timberland's second half and year-end results for 1994 which they did not believe or which lacked a reasonable basis given the existence of internal documents showing sharply lower [sic] expected results of operations."  Amended Complaint at ¶ 3(a).  Second, the defendants "failed to timely correct optimistic statements which had become materially false and misleading during the Class Period."  Id. at ¶ 3(b).  Third, the defendants "misrepresented and failed to disclose current and existing facts concerning Timberland's business, inventories and operations."  Id. at ¶ 3(c).  Fourth, the defendants "materially overstated Timberland's financial results by failing to write-down excessive, obsolete and defective inventories as required by applicable accounting rules and regulations."  Id. at ¶ 3(d).

On December 9, 1994, Timberland released its anticipated 1994 fourth quarter and fiscal year financial results.  At that time the defendants announced that Timberland would not reach anticipated sales levels and that its earnings per share would be lower than those from the prior year.  As a result of this

4

announcement, Timberland's stock dropped $4 3/8 to $22 5/8 per share.  The trading volume of 523,200 was more than five times Timberland's three-month daily average volume of 94,800.

The court will incorporate, _infra_, additional factual allegations, including some of the specific fraudulent statements and acts alleged by the plaintiffs, as necessary for its analysis of the instant motion.

## Discussion

The defendants have advanced three general legal theories in support of their motion to dismiss.  First, the defendants argue that the amended complaint must be struck to the extent that it contains new allegations which do not relate to the causes of action initially asserted in the two complaints filed prior to consolidation.  Second, the defendants argue that, for various reasons, the amended complaint fails to state an actionable securities claim against either the company or the individual defendants.  Third, the defendants argue that the plaintiffs have failed to plead fraud with the degree of particularity required by Rule 9(b).

## I.   Standard of Review

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) is one of limited inquiry, focusing not on "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). Accordingly, the court must take the factual averments contained in the complaint as true, "indulging every reasonable inference helpful to the plaintiff's cause." Garita Hotel Ltd. Partnership v. Ponce Fed. Bank, 958 F.2d 15, 17 (1st Cir. 1992); see also Lucia v. Prospect St. High Income Portfolio, 36 F.3d 170, 174 (1st Cir. 1994); Dartmouth Review v. Dartmouth College, 889 F.2d 13, 16 (1st Cir. 1989). In the end, the court may grant a motion to dismiss under Rule 12(b)(6) "`only if it clearly appears, according to the facts alleged, that the plaintiff cannot recover on any viable theory.'" Garita, 958 F.2d at 17 (quoting Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 52 (1st Cir. 1990)).

In the securities law context, the "court will not render any decision as to whether a particular statement is rendered misleading by a particular omission. It will merely determine whether Plaintiffs have sufficiently alleged circumstances under which plaintiffs could conceivably prove their claim[s]." Kas v. Caterpillar, Inc., 815 F. Supp. 1158, 1172 (C.D. Ill. 1992).

Finally, because the amended complaint presents a fraud claim the court also must determine whether the complaint satisfies the heightened pleading requirements of Rule 9(b), discussed infra. See, e.g., Romani v. Shearson Lehman Hutton, 929 F.2d 875, 878 (1st Cir. 1991).

The defendants have filed voluminous extrinsic materials, including analysts' reports, articles from trade publications, press releases, and internal company memoranda, in support of their motion to dismiss. See Defendants' Memorandum, Appendix. The defendants urge the court to consider these documents because "no principled reason exists to ignore the analysts' reports and other public information concerning Timberland that may have been available to the market in deciding whether the plaintiffs have stated a claim." Defendants' Reply Memorandum at 34 (citing In re Royal Appliance Sec. Litig., No. 94-3284, 1995 U.S. App. Lexis 24626 (6th Cir. Aug. 15, 1995) (per curiam); Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993); In re Allergan, Inc. Sec. Litig., No. SACV 89-643-AHS, 1993 WL 623321 (C.D. Cal. Nov. 29, 1993)). The defendants reason that consideration of these materials on a motion to dismiss is "consistent with [the court's] duty to bring a conclusion to a securities law claims [sic] which are unsupported by the evidentiary record 'at the first opportunity.'" Id. at 33 (quoting Allergan Sec. Litig., 1993 WL

7

623321 at * 20)). The plaintiffs respond that extraneous materials not referenced in the amended complaint are not properly before the court on a motion to dismiss. See Plaintiffs' Memorandum at 50.[3]

In recent years, some federal courts have embraced a more flexible Rule 12 practice in a limited number of circumstances by considering extrinsic materials without converting to a motion for summary judgment. See, e.g., I. Meyer Pincus & Assoc. v. Oppenheimer & Co., 936 F.2d 759, 762 (2d Cir. 1991) (prospectus properly considered by district court where complaint based solely on misrepresentations in prospectus but where plaintiff did not attach prospectus to complaint); Romani, 929 F.2d at 878-79, n.3 (offering documents properly considered by district court where complaint alleged documents to be source of securities fraud but where plaintiff did not attach documents to complaint); see also Fudge v. Penthouse Int'l, Ltd., 840 F.2d 1012, 1014-15 (1st Cir.) (in general, court may consider "pertinent" document where plaintiff relies on document but has not filed copy) (quoting 5 C. Wright & A. Miller, Federal Practice & Procedure §

_____

[3]The dispute over the court's consideration of extraneous materials is limited only to non-legal materials, such as those typically considered under Rule 56. Of course, the court will consider the appended legal authority and correspondence of counsel where necessary.

8

1327 at 489 (1969)), cert. denied, 488 U.S. 821 (1988).[4]

Moreover,

> courts have made narrow exceptions for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint.

Watterson, 987 F.2d at 3-4 (citations omitted). Without a doubt, a modified Rule 12 practice is attractive to corporations defending costly lawsuits because it allows them to deploy a fact-intensive defense, such as the truth on the market doctrine, at an early stage of the litigation. Nonetheless, the First Circuit continues to adhere to the traditional view that "[o]rdinarily, . . . any consideration of documents not attached to the complaint, or not expressly incorporated therein, is forbidden unless the proceeding is properly converted into one for summary judgment under Rule 56." Watterson, 987 F.2d at 3-4; see 2A James W. Moore, et al., Moore's Federal Practice ¶ 12.09[3] (2d ed. 1995) (decision to consider extrinsic materials rests with trial court's discretion); see also J/H Real Estate Inc. v. Abramson, 901 F. Supp. 952, 955 (E.D. Pa. 1995) (in securities fraud action, court refused defendants' submission of

---

[4]Notably, the defendants have failed to identify case authority for the proposition that the court is required to take cognizance of extraneous materials when ruling on a 12(b)(6) motion rather than exercise its discretion over the matter.

extraneous documents in support of motion to dismiss) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993), cert. denied, 114 S. Ct. 687 (1994)).

In this case the court favors the limited inquiry usually undertaken under Rule 12. The proposed consideration of extraneous documents on a motion to dismiss would bypass the Rule 12 scrutiny of the pleadings and, instead, would accelerate this litigation to the broader evidentiary inquiry reserved for summary judgment or, in the event of a factual dispute, trial on the merits. The court, in the exercise of its discretion, will not consider extraneous materials when ruling on the defendants' motion. This ruling applies with equal force to the plaintiffs, who also have submitted materials not suited to a motion to dismiss, e.g., affidavit of Candace Preston.[5]

## II. The Amended Complaint Does Not Violate Prior Court Order

The defendants assert that the plaintiffs have violated the letter and spirit of the court's April 24, 1995, order[6] by

---

[5]Of course, the court's ruling on the extraneous materials does not restrict the defendants' ability to refile them, along with any other materials properly considered under Rule 56(c), in support of a motion for summary judgment.

[6]The court issued two orders on April 24, 1995. The first order, designated by the clerk as document no. 12, was entitled the "Case Management Order" and is not relevant to the instant motion.

10

raising causes of action in their amended complaint that were not raised in the complaints initially filed in <u>Schaffer v. Timberland</u>, 94-634-JD, and in <u>Kreuser v. Timberland</u>, 95-04-L, and that are in some instances based "almost entirely on internal documents that Defendants produced during discovery." Defendants' Memorandum at 18. The defendants ask the court to exercise its Rule 16(f) discretion to strike the new allegations and causes of action from the amended complaint as an "appropriate sanction for Plaintiffs' clear-cut violation" of a pretrial order. <u>Id.</u> at 15-18. The plaintiffs respond that they have complied with the April 24, order and that their compliance is evidenced by an amended complaint which asserts one fewer cause of action than the prior complaints and is based on a narrower class period than previously alleged. Plaintiffs' Memorandum at 13, 16.

The April 24, 1995, order resolved a discovery dispute in which the plaintiffs sought to compel the same discovery the defendants wanted to stay. The order provided in pertinent part:

> In the opinion of the court, if the plaintiffs intend to raise new causes of action in their consolidated complaint, then discovery shall be held in abeyance until that complaint has been filed. If, however, the plaintiffs do not intend to raise any new causes of action in their consolidated complaint, then discovery can proceed. Within fifteen days from the date of this order, the plaintiffs shall inform the defendants in writing whether or not they intend to

11

> raise any new causes of action in the consolidated
> complaint.

Schaffer v. Timberland, No. 94-634-JD, slip op. at 2 (D.N.H. April 24, 1995). Three days later counsel for the plaintiffs notified the defendants that they "do not intend to raise any new causes of action in their consolidated complaint. Discovery, accordingly, may now proceed." Fax Correspondence from Shalov to Bodner, April 27, 1995.

The purpose of the order is clear, particularly when read in concert with the discovery motions it resolved. The court balanced the plaintiffs' legitimate desire for pretrial discovery against the defendants' understandable concern that such discovery would be used as the basis for entirely new claims. Thus, by electing to proceed with discovery before filing the amended complaint, the plaintiffs represented that they would not, to quote the defendants, use discovery as a "device for finding a cause of action instead of supporting an existing claim." Defendants' Memorandum in Opposition to Motion to Compel and in Support of Motion for a Stay at 9. The court now must compare the initial complaints with the amended complaint to determine whether the plaintiffs have lived up to this obligation.

The Schaffer complaint, filed on December 12, 1994, asserts liability for violations of section 10(b) and 20(a) of the

12

Exchange Act and securities regulations promulgated thereunder. The <u>Kreuser</u> complaint, filed on January 4, 1995, asserts liability for violations of the same federal laws and also under a state common law theory of negligent misrepresentation. In addition to Timberland, both complaints name the same two individual defendants. Collectively, the initial complaints allege a variety of acts and omissions as a factual basis for the legal claims. Without viewing each pleading under a microscope, these allegations relate to, <u>inter alia</u>, false or misleading public statements or omissions that were communicated through federal filings and reports to analysts and that concerned projected earnings and company performance and the quantity, nature, and marketability of excess inventory. <u>See</u>, <u>e.g.</u>, <u>Schaffer</u> Complaint at ¶¶ 24, 25, 27; <u>Kreuser</u> Complaint at ¶¶ 19, 20, 22, 24, 26, 29, 30. The <u>Schaffer</u> complaint alleged a class period from October 25, to December 9, 1994. The <u>Kreuser</u> complaint alleged a class period from February 15, to December 9, 1994.

The fifty-one page consolidated amended complaint, filed on June 23, 1995, alleges that the same three defendants violated the same federal laws that were identified in the initial complaints. The plaintiffs have narrowed the amended complaint from that asserted in <u>Kreuser</u> by abandoning the tort claim and by

13

alleging a class period from May 12, to December 9, 1994, a reduction of approximately three months from that originally plead. Significantly, the amended complaint asserts liability for the same types of false and misleading statements and omissions alleged in the initial pleadings, i.e., those related to earnings and performance projections and inventory matters. Moreover, each complaint alleges that the statements and omissions were disseminated through the same channels of communication, i.e., federal filings and reports to and by analysts.

The amended complaint does differ from the Schaffer and the Kreuser complaints in that it is considerably more detailed than its predecessors and contains numerous specific factual allegations not previously pled. The defendants argue that the amendments, particularly where accompanied by factual allegations not previously asserted, constitute an impermissible variance from the original complaints that violates the court's prior order and the resultant agreement of the parties. See, e.g., Defendants' Memorandum at 17-18 (arguing that plaintiffs' allegations concerning the failure to write-down material amounts of inventory are based in large part on internal documents produced during discovery).

14

The argument fails.  The court finds that the legal
assertions and factual allegations in the amended complaint
reflect a natural evolution from those articulated, albeit in
less detail, in the initial complaints.  The legal theories are
essentially the same and the new factual allegations are of the
same nature as those alleged earlier.[7]  Contrary to the
defendants' protestations, this degree of incorporation of
factual materials gleaned from discovery as <u>support</u> for
previously articulated legal theories, but not as the basis for
distinctly new theories, is neither a "bait and switch" tactic
nor the result of a discovery "fishing expedition."  <u>See</u>
Defendants' Reply Memorandum at 24 (citing <u>MacKnight v. Leonard
Morse Hosp.</u>, 828 F.2d 48, 52 (1st Cir. 1987); <u>Wayne Inv., Inc. v.
Gulf Oil Corp.</u>, 739 F.2d 11, 14 (1st Cir. 1984)).[8]  The court

---

[7]The court need not address the parties' dispute over the
proper definition of the term 'cause of action.'  However, the
court notes that counsel do not serve their respective clients by
sprinkling their memoranda with petty insults.  <u>See</u>, <u>e.g.</u>,
Plaintiffs' Memorandum at 21 (insinuating that opposing counsel
disregard basic law school principles); Defendants' Reply
Memorandum at 24 (replying to opposing counsels'"condescension"
by suggesting that counsel have not read cited authority).  In a
word, Stop!

[8]The court considers the instant attempt to strike portions
of the amended complaint to be based on a convenient reading of
the April 24, 1995, order and an overly narrow view of the
theories advanced in the initial complaint.  Such a view is
inconsistent with the liberal amendment philosophy underlying
Rule 15.  <u>See</u> <u>generally</u> 3 James W. Moore et al., <u>Moore's Federal</u>

15

finds that the amended complaint properly relies on the new factual allegations to amplify the causes of action identified in the initial pleadings, and, thus, the plaintiffs have neither violated prior court order nor breached the applicable rules of civil procedure and fair practice.

## III. The Truth on the Market Defense is Premature

The defendants next assert that, under what is known as the truth on the market defense, the fraudulent statements and conduct alleged in the amended complaint are not actionable because they are not representative of the full range of information available to the investor community during the class period. Defendants' Memorandum at 19. The plaintiffs respond that the defendants' truth on the market defense is, inter alia, premature, legally confused, and not supported by the defendants' own documents. See Plaintiffs' Memorandum at 42-45.

The plaintiffs rely in large part on the fraud on the market theory of securities liability. See Amended Complaint at ¶¶ 22, 23. According the Supreme Court,

> The fraud on the market theory is based on the
> hypothesis that, in an open and developed market, the

Practice ¶ 15.08[2] (2d. ed. 1995) (noting, inter alia, that amended complaints may involve departure from the facts previously alleged and, in some instances, may advance an additional cause of action arising out of the same transaction).

16

> price of a company's stock is determined by the available material information regarding the company and its business . . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.

Basic, Inc. v. Levinson, 485 U.S. 224, 241-42 (1988) (quoting Peil v. Speiser, 806 F.2d 1154, 1160-61 (3d Cir. 1986)). Although "reliance is presumed in a fraud on the market case," this legal presumption may be rebutted by evidence to "sever[] the link" between the fraudulent representations and the plaintiffs' market activity. Gross v. Summa Four, Inc., No. 94-364-B, slip op. at n. 6 (D.N.H. Nov. 8, 1995) (citing Colby v. Hologic, Inc., 817 F. Supp. 204, 209 n.7 (D. Mass 1993); see Rand v. Cullinet Software, Inc., 847 F. Supp. 200, 205 (D. Mass. 1994) (citing and quoting Basic, 485 U.S. at 241-42, 247); Kirby v. Cullinet Software, Inc., 721 F. Supp. 1444, 1449 n.5 (D. Mass. 1989)), appeal docketed, No. 96-1088 (1st Cir. Jan. 29, 1996).

In recent years defendants have attempted to rebut the presumption of reliance that accompanies a fraud on the market claim by operation of the truth on the market defense. See, e.g., Rand, 847 F. Supp. at 205, 206 (listing authority). Under this theory, the defendants argue that the public dissemination of credible and accurate "corrective information" cures or otherwise overcomes the manipulative effect of their allegedly fraudulent statements or conduct. See id. As a result, "those

17

who traded [the defendants'] shares after the corrective statements would have no direct or indirect connection with the fraud." Id. (quoting Basic, 485 U.S. at 248-49).

At its core, the defense stands for the proposition that the nature and volume of publicly available corrective information "effectively counter-balance[d]" whatever manipulative effect the fraudulent statement may have had on the market value. In re Apple Computer Sec. Litig., 886 F.2d 1109, 1115-116 (9th Cir. 1989), cert. denied, 496 U.S. 943 (1990). Thus, to prevail under this theory the defendants must establish at a minimum that the corrective "information has been made credibly available to the market by other sources," id. at 1115-16, and that the nature and proportion of the corrective information has yielded a "sufficiently curative effect," Rand, 847 F. Supp. at 206 (citing Apple, 886 F.2d at 1116).

The court finds that the truth on the market defense presented by the defendants necessarily involves a fact-intensive inquiry which is ill-suited to a motion to dismiss. See Rand, 847 F. Supp. at 206 (when evaluating defense under Rule 56, court must determine "whether a rational jury could find that full disclosure by the defendant would have significantly altered the total mix of information available to the reasonable investor"); In re Taxable Municipal Bonds Litig., No. MDL 863, 1994 WL 532079

18

at * 3-5 (E.D. La. Sept. 26, 1994) (defense is "fact intensive and, therefore, the defendants have an onerous burden on summary judgment.").[9]  The essentially factual nature of the defense is underscored by the defendants' submission of many extraneous documents, which are not properly considered at this time, to buttress their truth on the market theory.  See, e.g., Defendants' Memorandum at 22 ("Defendants thus invite the Court's attention to the documents included in the Appendix, which unequivocally establish that the market had full knowledge of the information Defendants allegedly concealed from the market.").[10]

---

[9]To the court's knowledge, the First Circuit has not addressed the truth on the market defense.  However, given the recognition of the defense by several other circuits and by at least one district court in this circuit, Rand, 847 F. Supp. at 205, for purposes of this motion the court assumes without deciding that the truth on the market doctrine theory is a legally cognizable defense to the plaintiffs' securities fraud claims.

[10]Indeed, some federal courts have even expressed skepticism over whether the defense may be successfully invoked under Rule 56 given that it typically presents questions involving the nature, extent, and ultimate market influence of the disclosed information -- an inquiry that would require a jury to weigh a volume of conflicting evidence and contrary inferences.  For example, the Municipal Bonds court recently denied summary judgment on this grounds, noting that

> [d]efendants can take solace in the fact that it is a rare case in which the defendant can carry its "staggering burden" under the truth on the market defense, particularly at the summary judgment stage.

1994 WL 532079 at * 5 (emphasis supplied); see In re Synergen, Inc. Sec. Litig., 863 F. Supp. 1409, 1421 (D. Colo. 1994)

19

The court finds that, in the context of the instant motion to dismiss, the defendants' reliance on the truth on the market defense is premature.  Of course, the defendants may redeploy the doctrine at an appropriate stage of this litigation.

IV.  The Allegations are Actionable

The plaintiffs have based their fraud claims in part on statements made by industry analysts and on statements allegedly made by the defendants to analysts and others.  The plaintiffs also allege fraud based on the defendants' failure to disclose certain internal company materials and on Timberland's failure to comport with accepted accounting principles.

In their motion, the defendants assert that they cannot be held liable for the statements of third parties and that whatever statements they did make are not actionable as a matter of law. The defendants further assert that they were never under any duty to disclose internal materials and that accounting deficiencies are not actionable under federal securities law.  The court will address the defendants' principal legal arguments seriatim.

_____

(summary judgment denied where parties submitted contradictory evidence on whether curative information rebutted presumption of market reliance on fraudulent or misleading statements); In re Columbia Securities Litig., 155 F.R.D. 466, 482 (S.D.N.Y. 1994) ("defendants' burden of rebutting the presumption of reliance [is] extremely difficult, perhaps impossible, to meet at the summary judgment stage").

20

## 1. Statements by Analysts

To maintain a securities fraud claim based on the statements of third parties, such as industry analysts, "the plaintiff must demonstrate that those statements may be fairly attributable to the defendants."  Summa Four, slip op. at 24 (citing Raab v. General Physics Corp., 4 F.3d 286, 288-89 (4th Cir. 1993)).  A plaintiff may survive a motion under Rules 12 and 9(b) by attributing the analyst statements to the named defendants by alleging sufficient facts to support the inference that the defendants "were responsible for the information" upon which the statements were based.  Kas, 815 F. Supp. at 1172; see Alfus v. Pyramid Tech. Corp., 764 F. Supp. 598, 602-03 (N.D.Cal. 1991) (analysts' statements may be actionable where based on earnings forecasts and other information disclosed by defendants).  This reflects the general rule that liability may attach to an analyst's statements where the defendants have expressly or impliedly adopted the statements, placed their imprimatur on the statements, or have otherwise entangled themselves with the analysts to a significant degree.  See, e.g., Elkind v. Liggett & Myers, Inc., 635 F.2d 156, 163 (2d Cir. 1980); Colby, 817 F. Supp. at 210 (noting that First Circuit has yet to determine under which circumstances third party statements are actionable and surveying case authority from other circuits); see also

21

Greenberg v. Compuware Corp., 889 F. Supp. 1012, 1020-21 (E.D. Mich. 1995) (liability may attach where analysts did attribute statements to defendants but may not attach where complaint alleged relationship between defendants and analysts in conclusory fashion); Stack v. Lobo, No. 95-20049-SW, 1995 WL 241448 at * 8 (N.D. Cal. April 20, 1995) (liability may attach where, inter alia, there existed a "two-way flow of information" between defendants and third party analysts); Columbia Sec. Litig., 747 F. Supp. at 245 (liability may attach where third party statements are materially misleading and directly attributed to defendants); see also Schwartz v. Novo Industri, A/S, 658 F. Supp. 795, 799 (S.D.N.Y. 1987) (liability may attach where defendants had "complete control" over the content of third party publication). Applying a tripartite test, some courts require plaintiffs pleading entanglement through the defendants' adoption of analysts' statements to

> (1) identify specific forecasts and name the [defendant] insider who adopted them; (2) point to specific interactions between the insider and the analyst which gave rise to the entanglement; and (3) state the dates on which the acts which allegedly gave rise to entanglement occurred.

In re Syntex Corp. Sec. Litig., 855 F. Supp. 1086, 1097 (N.D.Cal. 1994) (quoting In re Caere Corporate Sec. Litig., 837 F. Supp. 1054, 1059 (N.D. Cal 1993); citing In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 264 (2d Cir. 1993), cert. denied, 114 S. Ct.

22

1397 (1994)); see also Summa Four, slip op. at 25 (acknowledging but not adopting tripartite test). Although "it is unclear whether the First Circuit would require that the [analysts'] reports quote the defendants in order to impute the former to the latter," Summa Four, slip op. at 26, the court will determine whether the complaint contains allegations which, favorably construed and viewed in the context of the entire pleading, could establish a significant and specific, not merely a casual or speculative, entanglement between the defendants and the analysts with respect to the statements at issue. See Raab, 4 F.3d at 288; Stack, 1995 WL 241448 at * 7; Colby, 817 F. Supp. at 214-15, n.10; Kas, 815 F. Supp. at 1172. Once an analyst's statement is imputed to the defendants, the defendants may be found liable as if they made the statement themselves or if, at a later time, the defendants "failed to correct false and misleading information" contained in the statements even though they possess the knowledge to do so. In re Exabyte Corp. Sec. Litig., 823 F. Supp. 866, 873 (D. Colo. 1993) (citing Alfus, 764 F. Supp. at 603).[11]

---

[11]In light of this and other authority, the court rejects the broad assertion that the analysts' statements are irrelevant to the plaintiffs' claims simply because the statements were not directly made by the defendants. See Defendants' Memorandum at 35-36 ("statements made by analysts are not statements made by defendants and are thus irrelevant and inadmissible against the defendants as a matter of law") (citing Greenberg v. Howtek, 790

The plaintiffs have alleged, with varying degrees of specificity, that the defendants were sufficiently entangled with the analysts' statements contained in the amended complaint to survive the instant motion to dismiss. For example, the plaintiffs allege that

> [d]uring the week of February 7, 1995 [4?], defendants held a conference call with investment analysts to discuss the Company's reported operating results for the December quarter and fiscal year 1993. Participating on the call for the Company was defendant Jeffrey Swartz and Timberland's Chief Financial Officer, Keith D. Monda ("Monda"). Among other things, management stated on the call that Timberland's earnings for 1994 would be $3.00 or more per share. This representation was publicly disseminated in a February 15, 1994 analyst report prepared by Brenda J. Gall ("Gall") of Merrill Lynch Capital Markets ("Merrill Lynch").

Amended Complaint at ¶ 31. The plaintiffs further allege that

> [i]n June and July 1994, analyst Ruth of Montgomery Securities had further conversations with members of Timberland management, including discussions during a conference call held on July 21, 1994. Among those participating on the July 21, 1994, conference call for the Company were CFO Monda and investor relations director Lavelle. Among other things, Ruth was told during these conversations that fall bookings were

---

F. Supp. 1181, 1186 (D.N.H. 1992); Hershfang v. Citicorp, 767 F. Supp. 1251, 1255-56 (S.D.N.Y. 1991)). Moreover, the case authority cited by the defendants, when read in context of the circumstances presented by those cases, does not support, even by inference or reasonable analogy, such a broad and absolute prohibition against reliance on analysts' statements. Instead, Hershfang actually suggests that the third-party articles and statements alleged by the plaintiff would have been actionable if they were "attribut[ed] to defendants with the degree of particularity required by Rule 9(b)." 767 F. Supp. at 1256.

24

running ahead of Timberland's plan, that fourth quarter
sales growth would be higher than the growth realized
in the third quarter, and that initial Spring 1995
orders were strong. These statements and assurances
(which were publicly reported in the First Call reports
of Montgomery Securities dated June 27 and July 21,
1994), led Montgomery Securities to estimate 57% and
71% earnings gains for Timberland for the third and
fourth quarters respectively of 1994.

Amended Complaint at ¶ 41. The plaintiffs further allege that

[o]n or about October 25, 1994, defendants announced
Timberland's results of operations for the third
quarter ended [sic] September 30, 1994, and
contemporaneously held a conference call to discuss the
results. On the conference call for the Company were
Jeffrey Swartz, Keith Monda and Elizabeth Lavalle.
During the call, defendant Jeffrey Swartz said the
following about the Company's inventory levels:

> We are satisfied that what we own is good quality,
> salable inventory, principally core footwear
> styles in oversupply. . . . Obsolete inventory
> levels at Timberland are not any higher than
> historical levels, and their disposition will not
> have any material impact on our forward looking
> gross margin. What we have is excess, not
> obsolete inventory.

Swartz also said that "market demand for the brand is
strong" and expressly endorsed the sales and earnings
projections disseminated by various analysts:

> Regarding Q4, we believe that First Call
> [analysts'] estimates for our performance are
> reasonable, in terms of sales and earnings growth
> . . . . Regarding the planned 'at once' business
> for the remainder of the year, we monitor demand
> daily, and see so far continued strong demand for
> our brand, at levels that confirm the
> reasonableness of external estimates.

Based on these assurances, Merrill Lynch, in a report
dated October 26, 1994, expressed continued confidence
in the Company's short and near-term prospects. As

25

> stated by Merrill Lynch, "our single figure fourth
> quarter estimate is now $0.91 per share vs. $0.62 (this
> is within the 'street' range of $0.82-to-0.91 which
> management has termed reasonable)." The report also
> noted that Timberland's inventory levels were high, but
> repeated Jeffrey Swartz' express assurance that "the
> excess is predominantly in core products . . . and
> management therefore does not consider the markdown
> risk to be meaningful."

Amended Complaint at ¶¶ 47-49.

These and other allegations, when viewed in the context of the entire amended complaint, reasonably demonstrate that the analysts' statements were based on specific information provided directly by the defendants. Significantly, the plaintiffs have identified specific analyst statements and the insider information, sometimes directly quoted, upon which they allege the statements were based. They allege the nature, substance, and date of the communications between the analysts and the defendants. And the amended complaint identifies, by name, the parties to these interactions, a group that includes various analysts and their firms, and various members of Timberland senior management, including at least one of the individual defendants. This high degree of particularity is immediately apparent at paragraphs 47 through 49, where defendant Jeffrey Swartz is alleged to have made direct statements, excerpted verbatim, statements of approval of erroneous projections of outside analysts, and statements concerning the size and nature

26

of Timberland's inventory and the demand for its product.  The plaintiffs next allege, again in detail, that the following day Merrill Lynch directly relied on and incorporated Swartz's remarks into its report.  Allegations supported by this degree of particularity contain many key indicia of entanglement, e.g., Syntex Corp. Sec. Litig., 855 F. Supp. at 1097; Kas, 815 F. Supp. at 1172, and "would support a reasonable inference that the statements in question were based on false or misleading information obtained directly from the defendants."  Summa Four, slip op. at 26 (emphasis supplied).[12]  Accordingly, the court

---

[12]This lawsuit stands apart from those in which the complaint contained little more than nonspecific allegations of information exchanged between the defendants and analysts.  For example, this case is factually dissimilar from Summa Four, upon which the defendants heavily rely, where the court ruled that the third party statements may not be attributed to the defendants because

> [t]he analysts cited by the plaintiff . . . d[id] not directly quote the defendants or make reference to information provided by the defendants.  All three reports were presented as [the analysts'] independent opinions and [none] referred to any role of [the defendants] or its officers in the preparation, approval, or editing of the reports.  The amended complaint only states that some defendants had private communications with representatives from Montgomery Securities and Cruttenden & Company.

Summa Four, slip op. at 25-26 (internal quotation marks and citations omitted); see also Raab, 4 F.3d at 288-89 (complaint insufficient because, inter alia, "nowhere does the complaint plead with any specificity who allegedly supplied this information to [the analyst], how it was supplied, or how [defendant] could have controlled the content of the statement");

27

finds that the plaintiffs have satisfied Rules 12 and 9(b) to the extent they allege that the defendants are liable for the fraudulent analysts' statements.

### 2. Statements By Defendants

The defendants also assert that their own statements, as alleged in the complaint, are not actionable because they are, inter alia, vague and indefinite expressions of optimism, expressions of comfort, or statements of management initiatives. Defendants' Memorandum at 45-46.[13]

---

Greenberg, 889 F. Supp. at 1021 (reconciling Raab with Elkind, court found complaint insufficient where supported by conclusory allegations that defendant placed its imprimatur on third-party statement, did not adequately allege control over analysts, and did "not credit Defendants with having provided any specific information").

[13]The defendants also assert that some of their allegedly false or misleading statements are "accurate statements of historical fact" and, as such, are not actionable. Defendants' Memorandum at 46 n. 42.

The argument fails. Obviously, accurate statements cannot provide the basis for a claim of securities fraud. See, e.g., In re Software Publishing Sec. Litig., No. 93-20246-RMW, 1994 WL 261365 at * 3-4 (N.D. Cal. Feb 2, 1994) (citing In re Verifone, 784 F. Supp. 1471, 1481 (N.D. Cal. 1992), aff'd, 11 F.3d 865 (9th Cir. 1993)). But see Kirby, 721 F. Supp. at 1449 (allegedly fraudulent statements must be taken in context because "for the purposes of the federal securities laws, a statement may be literally true, but nevertheless misleading" (citing Gillette Company v. RB Partners, 693 F. Supp. 1266, 1286 (D. Mass. 1988)). However, consistent with the applicable standard of review, the court will not venture beyond the pleadings to inquire whether the allegations were, in fact, true. That is, for purposes of this motion, the court accepts as true the plaintiffs'

28

**a. predictive statements and vague statements of optimism**

Although inherently uncertain, predictions about future events "are not exempt from the anti-fraud provisions of the federal securities laws [because] . . . materially misleading predictions made with scienter are actionable." Rand, 847 F. Supp. at 207 (citations omitted); accord Summa Four, slip op. at 27 (adopting same authority). Affirmative forecasts of future business performance are actionable where they "create[] an influential impression in the eyes of the investing public." Alfus, 764 F. Supp. at 603 (quotation omitted). "Such forecasts create a duty to disclose [the] materially misleading information, or [to otherwise] remedy misleading omissions." Id.

Immaterial statements[14] and "[o]ptimistic, vague projections of future success which prove to be ill-founded" are not actionable. Salkind v. Wang, No. 93-10912-WGY, slip op. at 9 (D. Mass. March 30, 1995) (quoting Priest v. Zayre Corp., No. 86-2411-Z, 1987 WL 10741 at * 2 (D. Mass. May 1, 1987)); see

---

allegations that the defendants' statements were false, materially misleading, etc. See generally Cox v. Aurora Electronics, Inc., No. 93-3292-DT, 1993 WL 652792 at * 3 (N.D. Cal. Oct. 18, 1993).

[14]The court's consideration of whether the plaintiffs' allegations are sufficiently material appears infra.

29

Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 361 (1st Cir. 1994) ("optimistic prediction about the future that prove to be off the mark" not actionable); Elkind, 635 F.2d at 164 (comment that "we expect another good year" not actionable); see also Summa Four, slip op. 28 (reasonable investor would not rely on statements that are "general, vague, or lack specificity, or are not guarantees, even if made without a reasonable basis"). This is because courts assume that "investors know how to devalue the optimism of corporate executives, who have a stake in the future success of the Company." Verifone, 784 F. Supp. at 1481 (citing Weilgos v. Commonwealth Edison Co., 892 F.2d 509, 515 (7th Cir. 1989)).

Conversely, the court will not dismiss a complaint on vagueness grounds if the alleged statements are such that, given the surrounding circumstances, a reasonable investor may have relied on the statements and predictions. See In re Ames Dept. Stores Inc. Stock Litig., 991 F.2d 953, 959 (2d Cir. 1993) ("We are looking forward to stronger sales for the remainder of the year" held actionable); Casella v. Webb, 883 F.2d 805, 808 (9th Cir. 1989) (in securities fraud action under section 12(2), court reversed prior entry of summary judgment because, inter alia, question of whether reasonable investor would have relied on statement that investment was "a sure thing" or whether statement

30

was "innocuous puffery" "cannot be made in isolation but must be viewed in the context of the overall presentation") (internal quotation marks and citations omitted); Salkind, slip op. at 11-13 (several predictive statements held actionable, including "[w]e're a lot stronger now, and our financial problems are behind us" and "the Company will be positioned for profitability by the end of the fiscal year"); In re Gupta Corp. Sec. Litig., 900 F. Supp. 1217, 1236-37 (N.D. Cal. 1994) (statement that the "company's financial performance in 1993 offers some evidence of our potential" held actionable); Alfus, 764 F. Supp. at 602-03 (revenues and profits "leave[] us well positioned to fund our growth in fiscal 1989 and beyond" held actionable). The allegedly fraudulent statements cannot be viewed in isolation as "[t]he context in which a statement appears is an essential part of determining its legal adequacy." Kirby, 721 F. Supp. at 1449 (citing Isquith v. Middle South Indus., Inc., 847 F.2d 186, 201 (5th Cir.), cert. denied, 109 S. Ct. 310 (1988)); see Lucia, 36 F.3d at 175 ("emphasis and gloss can, in the right circumstances, create liability") (internal quotation marks omitted).

Given the caselaw, it is apparent that in many situations there is no standard by which a court can readily distinguish between actionable predictions and vague optimism or puffery. Thus, for purposes of this motion, the court considers the

31

allegations generously in the context of the overall pleading to determine whether the plaintiffs have marshalled their allegations into an actionable complaint.

The amended complaint predicates liability on a variety of statements that, according to the plaintiffs, lacked a reasonable basis in light of the specific adverse information alleged to have been known by or available to the defendants at the time the statements were made. For example, one or more of the defendants are alleged to have represented that "[d]emand and sell-through at retail is not a problem and the brand remains very strong," Amended Complaint at ¶ 46, and that "a majority of this inventory consists of classic Timberland models in oversupply that Management expects will be sold in the normal course of business," id. at ¶ 50. Statements of this nature, when viewed in the context of the full range of information allegedly available to the defendants during the class period, such as an internal plan to sell 126,000 units of excess, obsolete, and defective inventory at between 20% and 60% below cost, see Amended Complaint at ¶¶ 53-87, are sufficiently concrete, and not mere puffery or vague optimism, to constitute actionable statements under Rule 10-b. That is, in the court's opinion "the facts in the amended complaint would give rise to an inference that the Defendants either did not believe the statements or knew

32

that the statements were false." <u>In re Glenfed, Inc. Sec.</u>
<u>Litig.</u>, 11 F.3d. 843, 849 (9th Cir. 1993), <u>vacated on reh'g</u>, 42
F.3d 1541 (9th Cir. 1994) (en banc) (vacated original appellate
panel's affirmation of district court's dismissal of complaint).

### b. expressions of comfort

Although the First Circuit has not addressed the issue, as a
general matter, defendants' statements of comfort with or their
adoption or ratification of an analyst's projections may be
actionable where the statements are sufficiently specific and
accompanied by evidence suggesting that the defendants knew or
should have known that the statement was false or misleading,
<u>i.e.</u>, evidence of scienter, discussed <u>infra</u>. <u>See</u>, <u>e.g.</u>,
<u>Rubinstein v. Collins</u>, 20 F.3d 160, 168-69 (5th Cir. 1994); <u>In re</u>
<u>Cypress Semiconductor Sec. Litig.</u>, 891 F. Supp. 1369, 1377 (N.D.
Cal. 1995); <u>In re Adobe Sys., Inc. Sec. Litig.</u>, 787 F. Supp. 912,
916-18 (N.D. Cal. 1992), <u>aff'd</u>, 5 F.3d 535 (9th Cir. 1993). <u>But</u>
<u>see</u> <u>Malone v. Microdyne Corp.</u>, 26 F.3d 471, 479-80 (4th Cir.
1994) (adopting more stringent standard, court noted that
expressions of comfort are not actionable unless they rise to the
level of a guarantee of future business performance or are
otherwise specific enough to constitute a fraud on the market).
Under this theory, liability would attach directly to the

defendants' expressions of comfort because they "may, depending on the circumstances, amount to an implied representation that the [analysts'] reports are accurate." Cypress Semiconductor, 891 F. Supp. at 1377.[15]  Thus, at least for purposes of reviewing the adequacy of a complaint, the court finds no meaningful distinction between allegations of fraudulent statements which stand alone, e.g., company official states that "earnings will be at least $5.00 per share" and those allegations of fraudulent statements which derive their meaning from the adoption of the statements of others, e.g., company official states that "your predictions are accurate" in reference to analyst's statement that "earnings will be at least $5.00 per share."  For the same reason, vague expressions of optimism or puffery are never actionable, regardless of whether stated directly, as discussed

---

[15]This legal theory is distinct from that discussed supra where the defendants are held liable for the statements of others.  As explained in Cypress Semiconductor:

> in contrast to pre-publication entanglement, liability [for expressions of comfort] does not depend on imputing the analysts' statements to the company. Rather, the corporation's implied representation that the analysts' forecasts are accurate is itself actionable.  This is a subtle, yet important distinction between pre-publication adoption and post-publication ratification.

891 F. Supp. at 1369.

<u>supra</u>, or adopted through express or implied adoption, ratification, or statements of comfort.

Of course, for the defendants to be liable for their adoption or ratification of actionable statements, the plaintiffs must plead and, ultimately, must prove that the statements were, in fact, adopted. The caselaw reveals that, given the variety of expressions used in business, many of which are idiomatic or peculiar to a given industry or profession, there is no bright line to distinguish between those statements which constitute adoption or ratification and those which do not. <u>See</u>, <u>e.g.</u>, <u>Rubinstein</u>, 20 F.3d at 168-69 (characterization of analyst's statement as "realistic" found actionable); <u>Gupta Corp.</u>, 900 F. Supp. at 1235 (statement that defendant was "comfortable with Wall Street estimates that the company would earn 41 cents a share" held actionable but statement that predictions were "within reason" not actionable); <u>Adobe Sys.</u>, 787 F. Supp. at 916-18 (expressions of "comfort" with earnings estimates may be actionable where supported, <u>inter</u> <u>alia</u>, by evidence that the estimates were false or misleading). The statements and expressions made in reference to the analyst's reports, such as those alleged at paragraphs 45 and 48 of the amended complaint, satisfy Rules 12 and 9(b) because, fairly read in the context of the overall pleading, the allegations are sufficiently specific

35

to support the inference that the defendants adopted, ratified, or otherwise embraced the statements with scienter.

### c. management initiatives and "bespeaks caution"

The defendants further assert that, as a matter of law, neither statements concerning management initiatives, <u>i.e.</u>, statements describing company strategy, plans, or program, nor statements accompanied by cautionary language are actionable. <u>See</u> Defendants' Memorandum at 50-51, 55-56.  The court addresses each argument briefly.

According to the defendants, statements of management initiatives are not actionable because they are "nothing more than 'expression[s] of current endeavors aspiring to future benefits,' as opposed to 'assertions of future concrete financial results.'"  Defendants' Memorandum at 55 (quoting <u>In re Bell Atlantic Corp. Sec. Litig.</u>, 91-0514, 0518, 0531, 0673, 0737, 0748, 1991 WL 234236 at * 5-6 (E.D. Pa. Oct. 30, 1991)).[16]  The defendants' authority does not support the novel proposition that

---

[16]In support of their motion the defendants have repeatedly cited <u>Bell Atlantic</u>, a case in which the <u>district</u> court dismissed the plaintiffs' federal securities fraud claims with prejudice. <u>See</u> Defendants' Memorandum at 47, 52, 55, 57, 58.  The court notes with concern that the defendants have failed to indicate at any place in their memoranda that the Third Circuit <u>reversed</u> the very opinion upon which they rely.  <u>See</u> 993 F.2d 875 (3d Cir. 1993) (Table).

statements of "management initiatives," such as those concerning a certain inventory or cost-reduction strategy, are to be evaluated under a standard different from that applied to any other statement concerning current and future business performance. In <u>Bell Atlantic</u>, the court ruled public statements that employees were "redoubling their efforts to cut expenses" and "controlling expenditures throughout the business" were not actionable. 1991 WL 234236 at * 5. The court reasoned that such remarks were not sufficiently concrete and "cannot be construed to claim that efforts to control expenditures would, in fact, have an impact on lowering expense growth." <u>Id.</u> Thus, the <u>Bell Atlantic</u> court plainly treated the statements of management initiatives like any other predictive statements that were too vague to have been relied upon by a reasonable investor. <u>See</u> <u>id.</u> at 5-6.[17] Likewise, the Timberland defendants' public statements concerning the appropriateness of an existing business strategy,

_____

[17]The other case upon which the defendants rely, <u>In re Software Publishing Sec. Litig.</u>, 93-20246-RMW, 1994 WL 261365 (N.D. Cal. Feb. 2, 1994), also makes no distinction between the statement concerning management initiative, <u>i.e.</u>, "[w]e will continue to manage expenses and headcount levels with an eye on both short term operating realities and our long therm objectives," and other predictive statements. Contrary to the defendants' more expansive view of the decision, it is apparent that the <u>Software Publishing</u> ruling with respect to this particular statement stands for the unremarkable proposition that "statements of optimism . . . which do not create a misleading projection of future results" are not actionable. 1994 WL 261365 at * 5.

37

i.e., "inventory will be disposed of aggressively . . . and will not have any material impact on our forward looking gross margin," Amended Complaint at ¶ 47, are in substance no different from direct commentary on future performance, along the lines of "the inventory will not hurt the business." See generally Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1090-91 (1991) ("We think there is no room to deny that a statement of belief by corporate directors about a recommended course of action, or an explanation of their reasons for recommending it, can be ["actionable."]"). The court finds that statements concerning management initiatives, no less than other "materially misleading predictions made with scienter[,] are actionable." Rand, 847 F. Supp. at 207 (citations omitted).

Also deficient is the defendants' argument that any predictions prefaced with "expect," or couched in analogous terms, "bespeak[] caution, and thus preclude[] a finding of falsity or fraud." Defendants' Memorandum at 50 (citing Polin v. Conductron Corp., 552 F.2d 797, 806 n.28 (8th Cir.), cert. denied, 434 U.S. 857 (1977)).[18] The court rejects such a

[18]Under the "bespeaks caution" doctrine, certain material omissions or misrepresentations are legally immaterial when accompanied by meaningful cautionary statements. See, e.g., J/H Real Estate Inc., 901 F. Supp. at 955-56 (citing In re Trump Casino Sec. Litig.- Taj Mahal Litig., 7 F.3d 357, 371 (3d Cir. 1993)); see also Wilensky, 903 F. Supp. at 177 n.5 ("The bespeaks caution doctrine, as applied by most courts, merely reflects the

mechanistic view of the bespeaks caution defense.  See, e.g.,
Kas, 815 F. Supp. at 1172-73 (on motion to dismiss, predictive
statement held actionable even where modified by "expect");
Alfus, 764 F. Supp. at 602-03 (same).  In any event, given the
limited inquiry accorded a motion to dismiss, the court is not
now in a position to determine whether the "cautionary statements
[are] substantive and tailored to the specific future
projections, estimates, or opinions . . . which the plaintiffs
challenge."  J/H Real Estate, 901 F. Supp. at 956; cf. Wilensky
v. Digital Equip. Corp., 903 F. Supp. 173, 177 (D. Mass. 1995)
(on motion to dismiss, court ruled that under bespeaks caution
doctrine allegedly misleading statement in prospectus supplement
not actionable where both prospectus and supplement contained
sufficient cautionary language).

### 3. Duty to Disclose Internal Business Information

The defendants also argue at length that the amended
complaint is "dead on arrival," i.e., not actionable, to the
extent that it alleges a failure to disclose "internal

---

unremarkable proposition that statements must be analyzed in
context.") (internal quotation marks and citations omitted).  To
prevail under this theory, the "defendant must establish that the
cautionary statements 'discredit the other [allegedly fraudulent]
one so obviously that the risk of real deception drops to nil.'"
Id. (quoting Virginia Bankshares, 501 U.S. at 1097).

projections and other nonpublic information concerning Timberland's business, inventories and operations." Defendants' Memorandum at 59. The plaintiffs respond that the argument is "entirely irrelevant" because their amended complaint does not assert a duty to disclose such information. Plaintiffs' Memorandum at 37.

The amended complaint is replete with specific references to internal company information, including written reports, financial forecasts, and other data, which purportedly reflect the true health of the Timberland business. See Amended Complaint at ¶¶ 53-70. According to the plaintiffs,

> the various internal documents referenced in the Amended Complaint (reflecting, among other things, deteriorating margins, failure to achieve budgeted results of operations, downward revisions to earnings estimates, and sales declines in the Company's various business unites), are offered to show that defendants' positive statements and assurances about Timberland's current financial condition and future prospects were materially false and misleading at all relevant times.

Plaintiffs' Memorandum at 37-38. The plaintiffs further state that they

> are not alleging that defendants had an obligation to disclose the budgetary variances referenced in their various internal documents. What they are alleging is that, in light of the repeatedly negative and adverse information contained in these documents, defendants' contemporaneous public statements and assurances concerning levels of demand, inventory content, and future earnings were demonstrably false, misleading and/or lacking in reasonable basis when made.

Id. at 38.

The plaintiffs' proposed reliance on nondisclosed internal information is not only appropriate in this case but, in fact, is necessary to state a viable claim for securities fraud. As discussed infra, the plaintiffs need to, inter alia, identify with particularity the statements they allege were fraudulent, the factual basis for their claim that the statements were materially misleading, and that the defendants acted with scienter. See, e.g., Romani, 929 F.2d at 878 (motion to dismiss granted where complaint lacked allegations to support finding or inference that defendants knew or deliberately disregarded adverse business circumstances); DiLeo v. Ernst & Young, 901 F.2d 624, 627-29 (7th Cir.), cert. denied, 498 U.S. 941 (1990) (investors must point to some fact suggesting that [the] difference [between favorable projections and actual health] is attributable to fraud); Summa Four, slip op. at n. 5 ("[A] plaintiff's complaint must support an inference that the defendant's [sic] knew, or should have known, that the statements were false or misleading."); Rand v. M/A-COM, Inc., 824 F. Supp. 242, 257-59 (1992) (summary judgment denied where court found factual dispute over whether public projections lacked reasonable basis given "contrary figures" contained in company's mid-year estimates). Taken in a light most favorable to the plaintiffs,

41

the internal documents specifically identified in the complaint reveal, <u>inter alia</u>, a deteriorating financial condition, unachieved business forecasts, and significantly increased inventory levels that were not adequately addressed by management. <u>See</u> <u>generally</u> Amended Complaint at ¶¶ 53-87. For purposes of the instant motion, the court finds that the adverse information allegedly known by or available to the defendants, when contrasted with the auspicious public remarks, could support the finding that the public statements were false or materially misleading.

The plaintiffs may also rely on the nondisclosed internal information in support of the related claim that the defendants committed fraud by failing to make complete their misleading statements concerning the size, quality, and nature of Timberland's inventory. <u>See</u> <u>Lucia</u>, 36 F.3d at 175 ("It is equally well established that '[w]hen a corporation does make a disclosure -- whether it be voluntary or required -- there is a duty to make it complete and accurate.") (quoting <u>Roeder v. Alpha Indus., Inc.</u>, 814 F.2d 22, 26 (1st Cir. 1987)); <u>see</u> <u>also</u> <u>Capri Optics Profit Sharing v. Digital Equip. Corp.</u>, 950 F.2d 5, 7 (1st Cir. 1991) (no duty to disclose material internal information unless failure to disclose renders "what was said [at an earlier time] to be misleading") (citing <u>Backman v. Polaroid</u>, 910 F.2d 10

42

(1st Cir. 1990) (en banc)).  Thus, the failure to disclose the internal adverse information concerning Timberland's inventory situation, such as the audit findings and other specifically identified materials, <u>i.e.</u>, Amended Complaint at ¶¶ 68, 77, may be actionable to the extent that the allegations support the legally cognizable theory that the public statements concerning the inventory were inaccurate or materially misleading because they were incomplete.[19]

### 4. Failure to Write-Down Inventory

The plaintiffs have alleged that the defendants "materially overstated Timberland's financial results by failing to write-down excessive, obsolete and defective inventories as required by applicable accounting rules and regulations."  Amended Complaint at ¶¶ 3(c), 72 (failure to properly write-down inventory inflated inventory values and earnings).  In their motion, the defendants assert that under <u>Serabian v. Amoskeag Bank Shares, Inc.</u>, 24 F.3d 357 (1st Cir. 1994), and other authority the failure to comply

---

[19]The plaintiffs will be held to their representations, <u>see</u> Plaintiffs' Memorandum at 37-42, that they will not proceed under any additional, independent, theory of nondisclosure beyond those addressed by this order.  Thus, the court need not confront the defendants' arguments that the failure to disclose internal projections, the failure to achieve internal financial goals, and managerial incompetency are not, in and of themselves, actionable.

with sound accounting practices, such as generally accepted accounting practices ("GAAP"), cannot support an inference of fraud. Defendants' Memorandum at 73-76.

The court agrees that, as a general matter, the defendants' failure to competently perform necessary functions, including those involving sound accounting and other internal controls, is not actionable under the federal securities laws. See e.g., Serabian, 24 F.3d at 361-63 (citing Shapiro v. UJB Financial Corp., 964 F.2d 272, 281, 283 (3d Cir.), cert. denied, 506 U.S. 934 (1992)). Moreover, a "general allegation that [shoddy accounting practices] resulted in a false report of company earnings is not a sufficiently particular claim of misrepresentation." Id. at n.5. Accordingly, the court finds that the allegations directed at the failure to properly write-down inventories, even if true, do not themselves present a viable fraud claim. See id. at 362 ("Nothing in the complaint suggests that [the defendants' accounting practice] . . . was fraudulent, even if, as the complaint alleges, it was a violation of [GAAP].").

However, the court does not strike the accounting-related allegations because, in view of the overall pleading, the allegations may evidence the defendants' knowledge and, thus,

44

may support a cognizable fraud theory. For example, the plaintiffs have alleged that the defendants "misrepresented and failed to disclose current and existing facts concerning Timberland's business, inventories and operations." Amended Complaint at ¶ 3(c). Elsewhere in the amended complaint, the plaintiffs identify specific public statements in which the defendants essentially deny that the inventory situation presents a material problem. See, e.g., id. at ¶ 47. The allegations that earnings and inventory values were inflated by accounting deficiencies, if true and known by the defendants, could support an inference that the favorable public statements were false or materially misleading.

## IV. The Amended Complaint Satisfies Rule 9(b)

The defendants assert that the amended complaint must be dismissed for failure to plead fraud with the particularity required by Rule 9(b). The Rule provides:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally.

Fed. R. Civ. P. 9(b). The rule is designed "to apprise the defendant of fraudulent claims and of the acts that form the

basis for the claim[s]."  Hayduck v. Lanna, 775 F.2d 441, 443 (1st Cir. 1985); see In re Lotus Develop. Corp. Sec. Litig., 875 F. Supp. 48, 51 (D. Mass. 1995) (rule also protects corporate defendants from strike suits and unwarranted injury to reputation) (citing New England Data Serv., Inc. v. Becher, 829 F.2d 286, 289 (1st Cir. 1987)).  General or conclusory averments of falsity or fraud are insufficient as the rule "requires that the particular 'times, dates, places or other details of [the] alleged fraudulent involvement'" of the defendants be alleged. Serabian, 24 F.3d at 361 (quoting Glenfed, 11 F.3d at 847-58 (9th Cir. 1993)); see Lucia, 36 F.3d at 174; Summa Four, slip op. at 16-17 (describing standard of review and collecting authorities). Finally, the First Circuit has strictly enforced the Rule 9(b) pleading requirements in cases alleging federal securities fraud and related state claims.  E.g., Serabian, 24 F.3d at 361; In re Lotus Development, 875 F. Supp. at 51; Suna v. Bailey Corp., No. 94-273-M, 1994 WL 715877 at * 3 (D.N.H. Nov. 10, 1994).

In count one the plaintiffs allege that the corporate and the individual defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated by the SEC thereunder.  The statute and the rule collectively proscribe the direct or indirect commission of fraud in connection with the purchase or

46

sale of securities.[20]  To prevail, the plaintiff must establish

[20]Section 10(b) provides in relevant part that

[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange

.  .  .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe . . . for the protection of investors.

15 U.S.C.A. § 78kj (West 1981).

Rule 10b-5 provides in relevant part that

[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange

.  .  .

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5 (1995).

The Exchange Act underwent substantive revisions with the December 22, 1995, enactment of the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737.  Neither party has argued that the amendments are relevant to this litigation and, based on its own cursory review of the revisions, the court is satisfied that they do not apply to actions initiated prior to enactment.  See id., §§ 108, 202, 109 Stat. at

(1) a material misstatement or omission by the defendant; (2) scienter; (3) reliance; and (4) due care by the plaintiff. _E.g._, _Rand_, 847 F. Supp. at 204-05 (citing _Blue Chip Stamps v. Manor Drug Stores_, 421 U.S. 723, 730 (1975); _Kennedy v. Josephthal & Co._, 814 F.2d 798, 804 (1st Cir. 1987); _Kirby_, 721 F. Supp. 1444, 1448 (D. Mass. 1989)); _accord_ _Summa Four_, slip op. at 18; _Van De Velde v. Coopers & Lybrand_, 899 F. Supp. 731, 734 (D. Mass. 1995). "The two elements of 'fraud on the market' claims which are subjected to the closest scrutiny under Rule 9(b) are (1) whether there was a material misstatement or omission by the defendant, and (2) whether there was scienter." _Colby_, 817 F. Supp. at 209 (citing _Polaroid Corp._, 910 F.2d at 15-16; _Holmes v. Bateson_, 583 F.2d 542, 551 (1st Cir. 1978)). Accordingly, the court will address these two elements in detail.[21]

---

758, 762.

[21]The defendants also challenge the adequacy of the amended complaint with respect to the reliance element. However, given the court's unwillingness to pass on the defendants' premature invocation of the truth on the market defense, _supra_, the adequacy of the plaintiffs' allegations of presumptive market reliance on the false and misleading statements is not seriously in question. The allegations of a fraud on the market, Amended Complaint at ¶¶ 22, 23, coupled with the extensive and particularized allegations of fraudulent statements, some of which are discussed in detail by this order, are sufficient to give rise to a presumption of reliance for pleading purposes.

1. Materiality

"[M]ateriality depends on the significance the reasonable investor would place on the withheld or misrepresented information." Summa Four, slip op. at 18 (quoting Basic, 485 U.S. at 240). Thus, to satisfy this element

> there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

Rand, 847 F. Supp. at 205 (internal quotations omitted); accord Summa Four, slip op. at 18; In re Quarterdeck Office Sys., Inc. Sec. Litig., 854 F. Supp. 1466, 1472 (C.D. Cal. 1994); Colby, 854 F. Supp. at 209 (citing TSC Indus., Inc. v. Northway, 426 U.S. 438, 445 (1976)). The First Circuit also considers whether "there is a substantial likelihood that a reasonable shareholder would consider [the withheld or misrepresented information important to the investment decision." Lucia, 36 F.3d at 175 (internal quotation marks omitted).

With respect to statements concerning speculative information of projections of future events, materiality "will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of company activity." Basic, 485 U.S. at 238 (citations omitted); see also In re Compaq Sec. Litig., 848 F. Supp. 1307, 1318-19 (S.D. Tex.

49

1993) (where allegedly fraudulent statements were disseminated in a variety of ways and needed to be examined in context, court denied summary judgment because "there exists a genuine issue of material fact whether the statements are the type that a reasonable investor would have considered significant at the time.").  Finally, to satisfy Rule 9(b), the "particular times, dates, places or other details of [the] alleged fraudulent involvement of the actors must be alleged."  Serabian, 24 F.3d at 361 (quotation marks and citations omitted); see Romani, 929 F.2d at 878 (plaintiffs must identify the time, place, and content of the fraudulent statements).

Given the length of the amended complaint, the court declines to determine whether each of the allegations of false statements, material misstatements, or omission, as plead, is sufficiently material to support 10(b) liability.  Rather, consistent with the applicable standard of review, the court has determined that the overall amended complaint alleges sufficient fraudulent statements of a material nature to survive the instant motion.  See Synergen, 863 F. Supp. at 1418 (on summary judgment, court could "not conclude that the omissions are so obviously unimportant to reasonable investors in deciding whether to buy [defendants'] stock that reasonable minds cannot differ on the question of materiality.") (citing TSC Industries, 426 U.S. at

50

449).  For example, the court finds that the specific predictions concerning the defendants' anticipated earnings, discussed <u>supra</u>, are obviously material because "earnings forecast[s are] a shorthand description of the general financial well-being of a company."  <u>Alfus</u>, 764 F. Supp. at 603.  The court also finds that in this case the statements concerning the quantity and nature of the defendants' inventory, also discussed <u>supra</u>, are material given the financial significance of efficiencies in manufacturing, distribution, and inventory control to Timberland's core footwear and apparel businesses.  <u>See</u> <u>generally</u> <u>Lotus Develop. Corp.</u>, 875 F. Supp. at 52-53 (denying motion to stay discovery pending ruling on defendants' motion to dismiss, court noted that "[u]nusual backlogs [in inventory] may reasonably be expected to lead to decreased sales").  Indeed, the importance of the inventory-control matters is evidenced by Timberland's alleged public statements concerning its "level-loading" strategy and other matters related to the distribution of its product.  <u>See</u>, <u>e.g.</u>, Amended Complaint at ¶ 40.[22]

---

[22]The defendants also argue that the amended complaint must be dismissed because the plaintiffs "have not satisfied the loss causation requirement of Section 10(b)."  Defendants' Memorandum at 34.  Without addressing the extent to which the First Circuit has adopted the loss causation element, the amended complaint is sufficient under the Second Circuit authority upon which the defendants rely.  Specifically, the plaintiffs have alleged that they relied on market information when purchasing Timberland stock, unaware that the market price of the stock was

51

Accordingly, the court concludes that the plaintiffs have alleged sufficient false, misrepresented or withheld information which a reasonable investor would consider "important to the investment decision," <u>Lucia</u>, 36 F.3d at 175, or which would have "significantly altered the total mix of information . . . available," <u>Rand</u>, 847 F. Supp. at 205 (internal quotation marks omitted).

Finally, the amended complaint complies with Rule 9(b) because, in the court's opinion, the plaintiffs have pled with particularity the circumstances surrounding the allegedly fraudulent statements. As already noted with respect to the analysts' statements, <u>supra</u>, the plaintiffs have in many instances identified the source of the statement, the date, and the method of communication, <u>i.e.</u>, government filing, analyst's report, or press release. <u>See</u>, <u>e.g.</u>, Amended Complaint at ¶¶ 42, 44, 47-49. In this respect the complaint reflects a middle ground between Rule 9(b)'s emphasis on specifics and Rule

artificially and fraudulently inflated because of the defendants' unlawful conduct, and that, when the true information concerning the company's health came to light, the value of their investment dropped precipitously. <u>See</u> <u>Citibank, N.A. v. K-H Corp.</u>, 968 F.2d 1489, 1495 (2d Cir. 1992) ("To establish loss causation a plaintiff must show that the economic harm it suffered occurred as a result of the alleged misrepresentation.") L. Loss & J. Seligman, <u>Fundamentals of Securities Regulation</u> 1040-41, 1058-59, n. 299 (3d ed. 1995) (describing concept of loss causation and noting that the "proliferation of terms to describe causation in the federal securities laws is not helpful").

8(e)'s accent on concise and direct pleadings. The court finds that the amended complaint satisfies the materiality element for purposes of the instant motion.

## 2. Scienter

To plead scienter the plaintiff must allege "an intent to deceive, manipulate or defraud." Rand, 847 F. Supp. at 205 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976)). However, "the First Circuit has assumed, without deciding, that recklessness amounting to indifference is an acceptable substitute." Id. (quoting Hoffman v. Estabrook & Co., 587 F.2d 509, 516 (1st Cir. 1978)); see Summa Four, slip op. at n. 5. Thus, for purposes of Rule 9(b), "a plaintiff's complaint must support an inference that the defendant's [sic] knew, or should have known, that the statements were false or misleading," Summa Four, slip op. at n. 5 (citing Romani, 929 F.2d at 878)), or otherwise spoke in reckless disregard of the adverse information allegedly known or available at the time. This view is consistent with Rule 9(b)'s admonition that "[m]alice, intent, knowledge, and other conditions of mind . . . may be averred generally."

The amended complaint reasonably supports an inference that the defendants disseminated information that they knew or should

have known was false or materially misleading given the adverse internal information available during the class period. See Amended Complaint at ¶¶ 53- 87. The plaintiffs have identified, in many instances by name and date, a variety of internal documents and materials which were available to the defendants and purportedly contain negative performance data. See, e.g., id. at ¶¶ 61 (on September 1, 1994, directors learned of substantially lowered earnings estimates for third quarter); 65 (October 7, 1994, "Forecast Income Statement Variance Report" projecting year-end operating income to be $19.3 million less than budget); 85 (November 1, 1994, internal memorandum to defendant J. Swartz estimating total inventory of $240 million). Taken in a light most favorable to the plaintiffs, the adverse information contrasts with the decidedly more favorable performance data the defendants are alleged to have communicated to the public concerning financial performance and inventory control, discussed supra. Fairly read, these allegations "permit an inference that the [defendants acted with scienter because they] knew, or should have known, that [the] public statements were inconsistent with the actual conditions then being reported to them." Serabian, 24 F.3d at 365 (Rule 9(b) satisfied where "plaintiffs specifically identify the internal reports, and the public statements underlying their claims, providing names and

54

dates"). The court finds that the plaintiffs have plead the scienter with particularity in the amended complaint.[23]

V. Individual Defendants

The defendants also assert that the amended complaint fails to state a securities fraud claim against the individual defendants either as primary violators under section 10(b) and rule 10b-5, as alleged in count one, or as "controlling persons" of the corporate defendant under section 20(a), as alleged in count two. Defendants' Memorandum at 83.

With respect to claims under section 10(b) and rule 10b-5, "each defendant's role in the fraud must be particularized" in order to satisfy Rule 9(b). Shields v. Amoskeag Bank Shares, Inc., 766 F. Supp. 32, 40 (D.N.H. 1991). Thus, the amended

---

[23]The defendants assert that the allegations of fraudulent intent constitute a "classic example of 'fraud by hindsight'" and, as such, cannot satisfy the scienter element. Defendants' Memorandum at 81 (citing Anderson v. Clow, No. 92-1120-R, 1993 WL 497212 (S.D. Cal. Sept. 17, 1993)). The First Circuit does not permit plaintiffs to maintain a claim founded on fraud by hindsight, that is, allegations that defendants knew their public statements were false simply because conditions ultimately proved worse than stated. See Summa Four, slip op. at 27 (citing Serabian, 24 F.3d at 367; Lotus Develop. Corp., 783 F. Supp. at 710, 711 (D. Mass. 1992)). In contrast, the Timberland plaintiffs' claims of scienter rest on allegations that the defendants reviewed or could have reviewed certain, specifically identified, adverse materials which purportedly contained performance data significantly less favorable than that disseminated publicly. Thus, the amended complaint does not present a securities claim of fraud by hindsight.

complaint must allege more than the mere fact that the individual defendants were officers or directors of the corporate defendant. See Loan v. FDIC, 717 F. Supp. 964, 968 (D. Mass. 1989) (citing Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 119-20 (2d Cir. 1982)). The First Circuit has ruled that the "acceptance of responsibility for the contents of the Annual Report, demonstrated by defendants' signatures, combined with specific allegations that they knew of conflicting conditions, establishes a sufficient link between the defendants and the alleged fraud to satisfy Rule 9(b)'s particularity requirement." Serabian, 24 F.3d at 268 (citations omitted); see Wells v. Monarch Capital Corp., No. 91-10575-MA, 1991 WL 354938 at * 9 (D. Mass. Aug 23, 1991) ("The allegation that a corporate officer signed a false statement is sufficient to meet the particularity standard of Rule 9(b)").

With respect to claims alleging "controlling person" liability under section 20(a), a complaint is sufficiently particular where it alleges

> at a minimum the control status of the defendant, that "the controlling person directly or indirectly held the power to exercise control over the primary violator." Marbury Mgmt Inc. v. Kohn, 629 F.2d 705, 716 (2d Cir.), cert. denied, 449 U.S. 1011 (1980). "In the securities context, control means 'the possession, direct or indirect, of the power to direct or to cause the direction of the management and policies of [an entity], whether through ownership of voting securities, by contract or otherwise.'" Sheinkopf v.

56

> Stone, No. 90-1838 (1st Cir. March 7, 1991), Slip op.
> at 26 (quoting 17 C.F.R. § 230.405(1990)).

Wells, 1991 WL 354938 at * 11; see Salkind, slip op. at 17 (applying same legal principles); see also Synergen, 863 F. Supp. at 1422 (court noted that section 20(a) "is remedial and is to be construed liberally" when determining whether individual defendant was a controlling person (citations omitted)).

The amended complaint alleges with a high degree of particularity the knowledge of the individual defendants, their role in the fraud, and their significant financial and managerial control over Timberland. For example, some of the allegedly fraudulent statements were made directly by Jeffrey Swartz, i.e., Amended Complaint at ¶ 47, or were communicated in SEC filings or shareholder correspondence signed by both individual defendants, i.e., id. at ¶¶ 35, 43, 50. Likewise, the amended complaint plainly alleges that both individual defendants, as well as other members of Timberland senior management, received or had access to the nondisclosed, adverse information which, inter alia, forms the factual predicate for the claim that the public statements were false or materially misleading. See id. at ¶¶ 53-87. Finally, the amended complaint describes the individual defendants' significant ownership interest in Timberland, their status as directors, and their positions as the company's chief executive officer and chief operating officer. Id. at ¶¶ 11-15.

Given these and other allegations, the court finds that the plaintiffs have adequately pled their securities fraud claims against the individual defendants.

## Conclusion

The court has not undertaken the fact-intensive, fastidious review of the fifty-one page amended complaint sought by the defendants' motion to dismiss. This is because the "defendants have apparently confused what must be alleged by plaintiffs with what plaintiffs will be required to prove to withstand a summary judgment motion or to prevail at trial. To avoid dismissal, plaintiffs need only meet a sufficiency standard." Aurora Electronics, 1993 WL 652792 at * 3. Rather, the court has reviewed the overall complaint in a manner consistent with Rules 12(b)(6) and 9(b) and, based on this review, has determined that the [p]laintiffs have sufficiently alleged circumstances under which [they] could conceivably prove their claims[s] . . . at trial." Kas, 815 F. Supp. at 1172. Moreover, the complaint is sufficiently particular "to apprise the defendant[s] of the fraudulent claims and of the acts that form the basis for the claim[s]." Hayduck v. Lanna, 775 F.2d at 443.

58

<u>Summary</u>

The defendants' motion to dismiss (document no. 23) is denied.

The plaintiffs' motion for class certification (document no. 19) is currently under consideration. Pending resolution of the motion, the court will not entertain additional motions or supplementary materials unless the filing party has first received leave to do so under Local Rule 7.1(a)(4).

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
Chief Judge

March 18, 1996

cc:   Edward L. Hahn, Esquire
      Mark Levine, Esquire
      Lee S. Shalov, Esquire
      Steven E. Grill, Esquire
      John D. Donovan, Esquire
      Mark A. Michelson, Esquire